1

          **UNITED STATES DISTRICT COURT**
      **FOR THE EASTERN DISTRICT OF VIRGINIA**
            **ALEXANDRIA DIVISION**


| | | |
|---|---|---|
| **THE PRUDENTIAL INSURANCE** | ) | |
| **COMPANY OF AMERICA,** | ) | **Civil No. 20-450** |
| | ) | |
|     **Plaintiff,** | ) | |
| | ) | |
|  **v.** | ) | **Alexandria, Virginia** |
| | ) | **April 23, 2021** |
| **FRANK ZHANG, et al.,** | ) | |
| | ) | |
|     **Defendants.** | ) | |
| _____ | ) | |


          **TRANSCRIPT OF MOTION HEARING**
       **BEFORE THE HONORABLE T. S. Ellis, III**
         **UNITED STATES DISTRICT JUDGE**


**APPEARANCES:**

 **For the Plaintiff:**     **Nicholas Martin DePalma**
                       **Mark Partridge**


 **For the Defendant:**     **David Deal**


 **Court Reporter:  Patricia A. Kaneshiro-Miller, RMR, CRR**

2

1                    P R O C E E D I N G S

2                       (11:16 a.m.)

3          THE COURT:  All right.  You may call the next matter,

4     please.

5          THE DEPUTY CLERK:  The Court calls Civil Case The

6     Prudential Insurance Company of America versus Pru.com,

7     Case Number 2020-CV-450.

8          May I have appearances please, first for the

9     plaintiff.

10         MR. DePALMA:  Good morning, Your Honor.  Nicholas

11    DePalma, local counsel for the plaintiff, and Mr. Partridge

12    will be arguing the motion.  He's lead counsel, admitted pro

13    hac vice.

14         THE COURT:  All right.  Good morning to both of you.

15         MR. PARTRIDGE:  Good morning, Your Honor.

16         THE COURT:  Who's here for the defendant?

17         MR. DEAL:  Your Honor, David Deal for the claimant,

18    Shenzhen Stone.

19         THE COURT:  All right.  Mr. Deal, good morning to

20    you.  You may be seated for a moment.

21         Now, late in the afternoon, I received a request,

22    Mr. Deal, from your co-counsel from New York, asking to

23    appear telephonically.  Well, we don't do that.  This hearing

24    was scheduled weeks before today, and the night before the

25    hearing he wants to appear telephonically, so I said, no but

1    that I would hear local counsel if local counsel wished to

2    appear.

3              Mr. Deal, you're here.  And I think you're from

4    Crozet.

5              MR. DEAL:  I am, Your Honor.

6              THE COURT:  Well, welcome.  I actually live in

7    Albermarle County.

8              MR. DEAL:  Do you really?

9              THE COURT:  Yes, I do.

10             MR. DEAL:  Okay.  I would tell you where, but the

11   marshals would not approve.  But I do live in Albermarle

12   County, and like it very much.  I will say this much:  I live

13   on a mountain, Mr. Deal, that is part of the same range of

14   mountains of which Monticello is a member.  That much I can

15   disclose.

16             MR. DEAL:  It sounds like we're neighbors.

17             THE COURT:  Well, Crozet is north and west.

18             MR. DEAL:  I live in Charlottesville.  My office is

19   in Crozet.

20             THE COURT:   I see.

21             MR. DEAL:  So l live within viewing distance of the

22   hill that Monticello sits on.

23             THE COURT:  You see, I'm not on that hill.  I'm on a

24   hill -- and I think people would object to your calling it a

25   "hill," unless you're from Colorado, in which case they're

1   hardly a hill -- but the hill that I'm on is of that range

2   but east of that range.

3           MR. DEAL:  Okay.

4           THE COURT:  I'm closer to Orange.

5           All right.  Now, the matter is before the Court on

6   cross motions for summary judgment.  I'm familiar with the

7   briefs and the exhibits and the contentions and claims of the

8   parties.  I think the best way to proceed is I simply will

9   give you 15 minutes or so to tell me whatever you want to

10  tell me, and we'll see how much more we need.

11          Let's begin, Mr. Partridge, with you.  You're the

12  plaintiff in this matter.  You began the case in rem but we

13  have a claimant of the party that contends that it registered

14  the allegedly offending name.

15          Go ahead, sir.

16          MR. PARTRIDGE:  Yes.  Thank you, Your Honor.

17          I reflected it's been a year since I have been in a

18  courtroom because of the pandemic, so thank you for inviting

19  us back.  It's nice to be in a courtroom again.

20          As you know, Your Honor, Prudential is here to ask

21  you to grant summary judgment in its favor on its claims

22  against the pru.com domain name; that that domain name

23  violated Prudential's U.S. trademark rights in Prudential Pru

24  and Pru formative marks.

25          Through the briefing, the parties have come to a

1    point where we would submit that the necessary and essential

2    facts to support these claims in favor of the plaintiff are

3    undisputed.  We outlined or listed where the parties landed

4    on those in our reply brief, so there's a list there of what,

5    after the parties had gone back and forth on, these are the

6    points that the parties have agreed are undisputed, and that

7    starts on the first page of our reply brief in support of our

8    motion for summary judgment.

9         So, based on those, we submit that Prudential is

10   entitled to judgment in its favor as a matter of law.

11        Now, there are some legal issues that the parties

12   have raised, that the claimant has raised, and that we've

13   responded to, and those I think are useful to resolve or

14   present initially because they flavor the rest of the

15   discussion about the merits of the case.

16        The first point is what is the registration for the

17   purpose of this case.  That's a legal issue that claimant has

18   raised.  Prudential contends that the relevant registration

19   is claimant's registration of the domain name in 2017.  This

20   is based on the prevailing legal interpretation of the

21   statute, recognized by most of the circuits.  It hasn't been

22   addressed in the Fourth Circuit, but we urge the Court to

23   follow the prevailing law on this point.

24        Claimant relies on a decision from California from

25   the Ninth Circuit called *GoPets*, which has not been followed

1      by the other courts of appeal and has been dealt with

2      directly and criticized and explained as to why it should not

3      be followed.

4              The Ninth Circuit position was, and is, that the

5      registration that matters is the initial registration.  That

6      reads into the statute a word that's not there.  Interesting,

7      and I think instructive, claimant relies on a case from D.C.,

8      Vizer v. Vizernews, a case from 2012, and that case mentions

9      in dicta the *GoPets* case, which is why claimant cited it.

10     But that isn't how the case was decided.  The question before

11     the Vizer court was whether I can -- the governing body for

12     the assigned names and numbers -- registered a domain name

13     for the purpose of determining jurisdiction in D.C.  ICAN had

14     offices in D.C., and the plaintiff asserted that that was --

15     let them bring the case there because they were argued to

16     have registered the domain there.  Well, that Court considers

17     the *GoPets* case, but it goes on.  And it deals with what

18     "register" in the statute should mean.  They said the plain

19     language of the statute is that the plaintiff's trademarks

20     need to be distinctive at the time the domain name is

21     registered.  The Court there looked at the plain meaning of

22     domain name, and that's what -- of register -- and that's

23     what we would urge you to do.  ICAN -- well, it said the

24     plain meaning of "register" is to make a record, citing

25     dictionary authorities, *Blacks* and others.

1          The statute didn't define it, so the Court there

2     says, well, "register" may be defined as making a record of.

3     Thus, the Vizer court actually supports Prudential's position

4     here because that's exactly what GoDaddy, the registrar in

5     this case, did when claimant registered the domain name with

6     GoDaddy in 2017.  It made a record of the domain name.  And

7     that would be consistent with the prevailing law in all of

8     the circuits.

9          Claimant looks to a new case that came out this month

10     from Colorado.  That case we'd submit follows the minority

11     position, the *GoPets*' position, and should not be followed

12     here.  That position is flawed because it would allow a

13     junior user to find a prior domain name that was originally

14     used in good faith, acquire that domain name, and change that

15     use to a clear violation of the ACPA without liability.  That

16     was not the intent of the ACPA and should not be followed.

17          It's particularly important here because the initial

18     registration really is not relevant.  That initial

19     registration belonged to a company who used the initials PRU

20     for its business.  It's undisputed here that the claimant

21     doesn't have any rights in the name pru, it doesn't use that

22     as its name, it doesn't have any business under that name.

23     So it's in a very different position from what would occur if

24     you relied on the initial registration.

25          In short, the domain name was registered, that is,

1    GoDaddy made a record of the domain name in 2017 when the

2    claimant registered it with GoDaddy.  And you'll note in the

3    initial affidavits and discovery documents that the claimant

4    has submitted, it repeatedly said, we registered the domain

5    name in 2017.

6          Now, however, even if the Court goes along with the

7    *GoPets* ruling that the statute is limited to initial

8    registration and not when it's registered again at a later

9    time, it still doesn't support claimant here because the

10   Prudential marks were distinctive no matter which date you

11   pick.  They were distinctive in 1997, when pru.com was

12   registered initially by the first owner who used those

13   initials for its name, and it -- they're distinctive today.

14   We have the registrations that predate 1997.  Some of those

15   are incontestable registration, so they're conclusive

16   evidence of the distinctiveness of those marks.  The pru mark

17   itself, the registration indicates that it has a first use of

18   1968.  There is no dispute about when it was first used here.

19   So no matter which test you use, the -- the standard of the

20   statute is satisfied in terms of the registration.  But we

21   think the right conclusion is the conclusion followed by the

22   majority of the courts of appeal; that is, registration means

23   make a record.  It includes the initial registration and

24   subsequent registrations.

25         The second legal point to cover is whether claimant

is responsible for the use of the domain name, pru.com, in the United States.  There is undisputed evidence that pru.com was used in the United States for a parked page with advertising links to Prudential and competitors and with an offer for sale.

THE COURT:  Tell me what you mean by that.  You say it is undisputed that, and tell me in more detail what you're saying.

MR. PARTRIDGE:  Correct.  So it is undisputed that pru.com was used -- that means it was the URL for a park page website, under pru.com; that on that website were links to various businesses.  What would show up on the website would be Prudential's names and names of Prudential businesses with links and also names of Prudential competitors with links, advertising links.  Those are pay-per-click advertising links for the purposes of generating revenue.  There was also a link --

THE COURT:  Who puts those on there?  Isn't that GoDaddy that puts that on there?

MR. PARTRIDGE:  That is the point I'm getting to on the legal issue.  What the claimant did -- and I think this is important -- they said, well, we didn't do it, GoDaddy did.  But look deeper at what's happening.  They chose -- and I heard you emphasize the importance of choices -- they chose, the plaintiff chose to register the domain name with

1    GoDaddy.  In doing so, it chose the registration agreement

2    that it would be bound by.  In fact, it's registered over a

3    hundred domain names with GoDaddy over nearly a 10-year

4    period.

5            THE COURT:  Who has?

6            MR. PARTRIDGE:  The claimant in this case has

7    registered with GoDaddy.  The basic contract law is that when

8    you agree to an agreement, you're presumed to understand what

9    the agreement says and intended natural results of that.  The

10   registration agreement specifically explains what will happen

11   in terms of a parked page; that this page will be set up and

12   will have advertising links on it.  It also gives the

13   registrant the right to change that.  They may redirect the

14   domain name somewhere else.  They may have no content at all.

15   But here the claimant made the choice to go to GoDaddy in the

16   United States, become subject to U.S. law, and become subject

17   to the registration agreement which informed it, that it

18   would be a parked page with advertising links unless it did

19   something else.  And it has to be bound by that.  That is

20   basic contract law; that it has to be held to what it has

21   agreed to.  So that's our position on that responsibility.

22   It can't escape the responsibility by saying, I registered

23   these domain names with GoDaddy a hundred times but I don't

24   know what the contract means.  He is bound as a matter of

25   law.  That's what we submit, that he's bound as a matter of

—11—

1    law to the natural consequences of what he agreed to.  The

2    agreement tells him that there will be a parking page,

3    therefore he agreed to that.  And he had the legal

4    responsibility for it and the right to change.

5         There's a case that they rely on from Arizona, the

6    *Dent* case, and we'd submit to you that the *Dent* case is

7    contrary to the law that would apply in Virginia for

8    contracts, contrary to the law that would apply in Arizona

9    for contracts, on being bound to the terms of what you agree

10   to.  In that case, *Dent* does say that the registrant was not

11   responsible.  That's one case from a different circuit.  We

12   submit clearly this is wrong as a matter of law because it is

13   contrary to standard contract law.  The GoDaddy agreement

14   that the claimant chose to accept identifies that there will

15   be by default a park page and gives them the ability to

16   change that.

17        I think it is important to consider, though, the

18   natural consequences of viewing it a different way.  If we

19   say -- if we conclude that a domain name registrant is not

20   bound by and held to be responsible for what's in its

21   registration agreement, that leads to results that would be

22   contrary to what's intended by the ACPA.  It would allow

23   deliberate cyber squatters to avoid liability by registering

24   with GoDaddy, allowing the domain name to be used on a park

25   page while it waits for a large offer to purchase the domain

1    name without liability.  It can wait until -- that's one of

2    the very acts that the ACPA is designed to stop.  And so that

3    would undermine the cyber squatting statute to conclude that

4    registrants are not responsible for the terms of the

5    registration agreements they submit to.

6         A third legal issue to face in analyzing the

7    undisputed facts here is whether claimant's alleged plans for

8    use in China are entitled to any weight.  Prudential contends

9    they are not on these claims.

10         First, it's admitted that that use never happened,

11   that alleged use.  And we can talk later about the specific

12   allegations of the use.  We contend the evidence is not

13   sufficient to establish credibility in those claims.  But as

14   a matter of law, they're not relevant.

15         And how do we know that?  Well, we have the guidance

16   of the Fourth Circuit on this very point.  And in fact, the

17   claimant relies on the *Harris* case to urge this Court to

18   consider its alleged plans in China.  However, *Harrods* is

19   very different, very distinguishable.  In that case, the

20   registrant had a longstanding history of using the trademark,

21   decades of use of the trademark.  And so the Court considered

22   its plans to use its well established trademarks for a domain

23   name.  That's very different from what is present here, where

24   the claimant has no rights to the name, has never used pru

25   before, and acknowledges that.  It's undisputed.  But *Harrods*

1    gives us further guidance.  It is very instructive on this

2    point.  It recognizes -- because this, I think, is important,

3    I will cite it -- 302 F.3d 214, 235 is where this appears.

4    *Harrods* recognizes that its reasoning in the *Harrods* case

5    wouldn't apply where the registrant had no prior use or

6    rights of the name.  It says, quote, Congress did not list

7    the proposed future use of a domain name as a factor

8    presumably because it would be too easy for a cyber squatter

9    to claim an intent to use a disputed name in the future.

10   Indeed, the use of another's trademark as a domain name to

11   sell goods or services is precisely one of the evils that

12   ACPA is aimed at combatting.

13        The lesson of that is that on the ACPA claim, the

14   factor for good faith is whether the domain name has been

15   used by the registrant, the claimant here, has been used for

16   a bona fide site.  It doesn't say whether there has been an

17   intent.  So we submit following *Harrods* that the evidence

18   about use in China or the alleged use in China is not

19   relevant to consideration on the ACPA claims on plaintiff's

20   motion as a matter of law.

21        So with those legal positions just discussed and the

22   undisputed facts listed in our reply, we submit Prudential is

23   entitled to judgment as a matter of law.  The legal standard

24   provided under the statute -- and I know these are familiar

25   to Your Honor -- 1125(d)(2)(A) -- is whether the domain name

—14—

1   violates any right of the owner of a mark registered and

2   protected under the Lanham Act.

3          Pru.com violates plaintiff's rights under the ACPA

4   for cyber squatting, and it violates Prudential's rights

5   under 1125(a) for trademark infringement and the provisions

6   of the Lanham Act for protecting registered trademarks.

7          For cyber squatting, the legal standard is in

8   1125(d)(1)(A).  "A person shall be liable to the owner of the

9   mark if that person has a bad faith intent to profit from the

10  mark and registers, traffics in, or uses a domain name that

11  is identical or confusingly similar to a mark which was

12  distinctive at the time of of registration of the domain

13  name.

14         So each of those three elements is satisfied here.

15  The domain name was registered and used in the United States.

16  I want to emphasize that again.  The claimant here made a

17  choice to register -- first of all, to register a dot com

18  domain name, which as this court knows, the registry for that

19  dot com domain name is in the United States.  And in

20  addition, it chose to use a registrar, GoDaddy, to register

21  the domain name in the United States, agreeing to the terms

22  of the registration agreement.  And again, this is something

23  that it has done a hundred times in the United States with

24  GoDaddy.

25         The marks at issue -- the second element -- the marks

1      at issue were distinctive at the time of the registration of

2      the domain name.  If you look at 2017, when claimant

3      registered the domain name with GoDaddy, the registrations

4      put in evidence and cited in our brief, cited in the

5      complaint, were registered, many of them were incontestable,

6      they were either prima facie evidence or conclusive evidence

7      of the distinctiveness of those marks, and there is no

8      evidence to rebut them.

9            The same is true for most of those marks in 1997.

10     One of the pru formative marks goes back to 1988.  The pru

11     mark itself was registered after 1997, but it relied on first

12     use back to 1968.  And so it, too, through common law, is a

13     mark protected under 1125(a) and is distinctive at the time

14     of registration, no matter which date is chosen.

15            Finally, the domain name was used with a bad faith

16     intent to profit from the marks.  So how do we determine

17     that?  It's not always easy to determine bad faith and

18     intent, but the statute, 1125(d)(1)(B), gives ten factors to

19     consider.  This factor test is important.  It is a central

20     part of the statute.  And just quickly to touch on them,

21     number 1, claimant's trademark rights in pru.com.  Claimant

22     admits that it had no such rights.  Whether the domain -- 2,

23     whether the domain name is the legal name of the claimant.

24     Claimant admits that it is not named or known by that name.

25     A very important factor to distinguish its situation from the

1    Fourth Circuit's *Harrods* case.

2         The person's use of the domain name in connection

3    with a bona fide offering of any goods or services.  Claimant

4    admits that the domain name was never used for a bona fide

5    offering of any goods or services.

6         Point 4, the person's bona fide noncommercial or fair

7    use of the domain name for a website.  Again, claimant admits

8    that it did not make noncommercial or fair use of the domain

9    name.  And when I say admits, this is through the briefing

10   process, where the uncontested fact is presented to them in

11   the brief and they admit that they do not dispute it.

12        The person's intent to divert consumers to a site

13   that could harm the goodwill of the mark or create a

14   likelihood of confusion.  Here again, there is no dispute

15   that the domain name pru.com was used for a website in the

16   United States with an offer to sell the domain name and with

17   paper-clipped advertising links to Prudential and its

18   competitors.  This use was likely to harm Prudential's

19   goodwill and create a likelihood of confusion.  That is the

20   kind of use we discussed early on.

21        THE COURT:  With respect to this factor, what do you

22   say to the argument by the claimant that he argued means

23   Prussia in Chinese or news agency organization?

24        MR. DEAL:  As far as meaning Prussia, that's an

25   interesting thing.  On the deposition he was asked about

—17—

1    that.  He was very evasive but he had to acknowledge that his

2    website has nothing to do with Prussia.  He said, well, it is

3    the name of Prussia, the country.  The country doesn't exist

4    anymore.  I remember a judge who would tell me in

5    circumstances like this, that's too clever by half.  It's

6    like the *Sporty's Farm* case, where it doesn't add up.  Why

7    would you pick Prussia for a website that doesn't have

8    anything to do with Prussia.

9            THE COURT:  Let me ask you something, Mr. Partridge.

10   I'm an old man, and I remember practicing law when you filed

11   depositions.  Don't do that anymore.  It's been a long time.

12   Suppose I wanted to look at the deposition of this person.

13   He was a representative or the party of the claimant, who was

14   it?

15           MR. PARTRIDGE:  Yes, Mr. Zhang.

16           THE COURT:  Where is his deposition --

17           MR. PARTRIDGE:  There are excerpts of his deposition

18   in connection with our initial submission.  It is in there as

19   an exhibit, I believe, on my declaration, which includes

20   excerpts from his deposition.  And Mr. Mercer, on his initial

21   submission, included I believe the entire transcript as an

22   exhibit to his declaration.  So it is in the record.

23           THE COURT:  All right.  Go ahead.  You're on number 6

24   now.

25           MR. PARTRIDGE:  Yeah.  Well, there's still some more

1      points I want to make about that.  Again, the use -- this

2      use, as we discussed, he's bound to by contract to be

3      responsible for.  He knew when he entered the registration

4      agreement as a matter of law that there would be a park page

5      doing these things.  The law presumes that the registrant

6      intended the use of the domain name as set forth under the

7      registration agreement.  So, as a matter of law, this factor

8      is satisfied.

9             The next point is the person's offer to sell a domain

10     name for financial gain without having use -- an intent to

11     use or intent to use the domain name for a bona fide offering

12     of goods or purposes.  It is undisputed here that the domain

13     name was offered for sale on the pru.com park page.  Again,

14     it is undisputed that the --

15             THE COURT:  How?  I have seen this park page.

16             MR. PARTRIDGE:  The park page has a link where you

17     could go to attempt to buy the domain name.

18             THE COURT:  How is that link identified?

19             MR. PARTRIDGE:  "Get this domain name."  That's on

20     one of the sites that's in the record.  I believe it's "Get

21     this domain name."

22             THE COURT:  When you say, "Get this domain name,"

23     that's a phrase or a sentence that you could click on?

24             MR. PARTRIDGE:  Correct.  It's in a box.

25             THE COURT:  All right.  Go ahead.

1           MR. PARTRIDGE:  And it is undisputed that it was

2    there.  It is undisputed that this domain name was never used

3    for anything else.

4           The evidence also shows that the claimant evidenced a

5    willingness to sell the domain name for profit.  The facts

6    here are a little interesting, but it looks like the ultimate

7    conversation that Mr. Zhang had with the GoDaddy

8    representative, Ms. Zhang in China, is not in dispute.  He

9    says he got e-mails from her, that he did not respond to the

10    e-mails.  But there is a business record from GoDaddy with a

11    transcript of the call.  And in that call he expresses a

12    willingness to consider selling the domain name.  He says

13    that he's already received six figure offers.  He wants to

14    know what the business is, and he says, when he knows that,

15    he'll consider the offer.

16           THE COURT:  And you say this is in the record?

17           MR. PARTRIDGE:  Yes, this is in the record.

18           THE COURT:  Where?

19           MR. PARTRIDGE:  That exchange with GoDaddy, the

20    GoDaddy business record, is one of the exhibits to my

21    declaration in our initial submission.

22           THE COURT:  All right.  Go on.

23           MR. PARTRIDGE:  The law that we've cited in the

24    briefs recognizes that many domain name owners who are

25    seeking to profit from domain names know the rules and they

1    avoid making the commitment to offer it for sale.  So the law

2    recognizes that this factor is satisfied by a willingness to

3    sell the domain name for profit.  So we submit that there

4    isn't a material dispute on this point, that there was a

5    willingness expressed to sell the domain name for substantial

6    profit.

7            This is one of the factors -- and of course, this is

8    a multifactor test where not all factors are required but the

9    weight of the factors matters, and the weight of the factors

10   compels the result we're proposing.

11           There's still a few more.

12           The seventh point, was there material and misleading

13   contact information in connection with the registration of

14   the domain name?  The record shows -- well, first of all,

15   claimant has told this Court early on in the case that the

16   domain name was registered on behalf of Shenzhen Stone or at

17   the behest of Shenzhen Stone.  However, Shenzhen Stone was

18   never identified in the registration contact information.

19   Instead, the initial registration contact information

20   identified Bailun as the registrant organization.  You noted

21   this in your decision on the motion to dismiss.

22           Then claimant used a privacy service to shield its

23   name and the registrant name during the life of the

24   registration.  That privacy shield was not lifted until the

25   UDRP action was brought, at which point the registration

1    record could be seen.  This caused confusion at the point in

2    the court, and the interesting thing is that -- that at the

3    initial stage in this case, there is no explanation from the

4    claimant about who Bailun was or what the relationship was.

5    By the time we got to August, when there was a motion to set

6    aside the default, there was a document filed that indicated

7    that Mr. Zhang was the owner of Bailun and that Shenzhen

8    Stone and Bailun were related parties.

9            Then, during the deposition, for the first time,

10   Mr. Zhang identified and acknowledged that he was not only a

11   mere employee of Shenzhen Stone, as I think he

12   suggested -- well, he did suggest by saying that he was an

13   employee of Shenzhen Stone at the UDRP stage.  At the

14   motion-to-dismiss stage, he changed that to a senior

15   executive.  At the -- in August, he changed that to that he

16   was the CEO.  At the time of his deposition in March, last

17   month, he said he was the founder, owner, and CEO of both

18   companies and he controlled their actions.  Over time he has

19   made shifting changes about these relationships.  And I would

20   suggest that this is the kind of conduct that you were

21   noting, Your Honor, in the motion to dismiss, where the exact

22   parties responsible for this are -- there's obfuscation -- I

23   have a hard time with that word, pronouncing it -- about

24   that.  This is a factor to consider on this point of whether

25   the claimant used misleading information.  The claimant did.

1    It has said the registrant is Shenzhen Stone, yet that party

2    is never identified in the registration contact information.

3    He's been unclear about who's responsible, who the owner is,

4    who Bailun is.  Nothing was explained until later in the case

5    about that, and these are factors to consider.

6            There is another point on this, which is the

7    undisputed changes that took place in the account

8    information.  The account information is within GoDaddy and

9    not seen by the public, but there are interesting changes

10   that were made in that.  At the time the UDRP action was

11   brought, changes were made in the account record.  Mr. Zhang

12   was not identified at that point in time.  Changes were made

13   to identify him as the owner of the account.  But he made

14   changes over time.  He represented to the Court that the

15   account information gave his full name.  That's misleading.

16   That information changed over time.  It was true at the time

17   he made the statement in his declaration, but it was not

18   consistent prior to that.  This, again, a set of undisputed

19   facts that show misleading steps about the registration

20   information.

21           Why?  I would suggest it served his interests at the

22   motion-to-dismiss stage to minimize his role.  Later, it

23   served his interests to say he was the one responsible for

24   the registration; that he controlled Shenzhen Stone and

25   Bailun, so the confusion -- there was no real confusion, it

1    was just all one entity.  But that came later.  Anyway, it's

2    undisputed facts to consider on this factor.

3            The next factor is the registration of multiple marks

4    of others.  Claimant admits that it registered multiple

5    domain names, including the distinctive marks of Google,

6    Quora, and Yelp.  It asserts that it did not know that these

7    were the marks of others.  That assertion is not believable.

8    The company surely knew that these were the marks of others.

9    We have put in, with a Charlie Giger declaration, for

10    example, that Google is -- that Google's Chrome browser,

11    which is the trademark the claimant registered, Chrome, is

12    the most popular browser in China, the most popular mark for

13    a browser.  And so this is a factor that can be considered,

14    registering marks of others.  He says he didn't know, but we

15    submit that that is not credible.

16            Finally, the distinctive of the mark incorporated by

17    the domain name.  I have already touched on this.  Claimant's

18    trademark registrations are prima facie and incontestable

19    evidence of distinctiveness of those marks, and that is the

20    case whether you look at the registration in 2017 or 2000

21    -- 1097.  We submit that the relevant registration, again, is

22    the one in 2017 by claimant.

23            So, in summary, there is no genuine issue of material

24    fact on the cyber squatting claim, and Prudential is entitled

25    to judgment as a matter of law.

1          THE COURT:  At one point in your argument you said

2     ten, but there are really nine factors, right?

3          MR. PARTRIDGE:  You're right, Your Honor.  I

4     misnumbered on my notes.

5          THE COURT:  All right.  And those are factors that

6     really the statute sets out for the court to make a

7     determination on bad faith.

8          MR. PARTRIDGE:  Correct, Your Honor.

9          THE COURT:  All right.  What else do you have?

10          MR. PARTRIDGE:  The next claim is the trademark

11     infringement claim.  The ACPA in rem section of the statute

12     says, you may consider any violation of trademark rights

13     under the ACPA provisions.  And Your Honor, you've noted in

14     other cases that that includes a trademark infringement

15     claim, and that's also one of the claims presented here.  The

16     trademark infringement claim probably is -- I think could be

17     handled pretty quickly.  There is a set of elements to be

18     considered, but only one is challenged here.  The claimant

19     only challenges the element of whether or not the domain name

20     was used in commerce, meaning used in commerce in the United

21     States or commerce that can be controlled by the United

22     States.  And given what has happened in the United States,

23     pru.com is a U.S. domain name.  It's registered with a U.S.

24     registrar.  The agreement provided that there would be a park

25     page; that it would be used with advertising links unless the

1    registrant claimed otherwise.  This use took place in

2    commerce in the United States.  And the cases have recognized

3    that operating a site, allowing a site to be operated when

4    you're responsible for it, which has links to other

5    businesses, is use in commerce.  So the provisions of -- for

6    the trademark claim are also established.

7              So in short, if -- applying the positions on the

8    legal issues, which is the importance of the registration

9    agreement, the *Harrods'* position on whether the domain name

10   was actually put in use versus whether there is allegation of

11   use, what's required is that it was actually put in use,

12   which never happened here.  So that factor favors Prudential.

13             As a matter of law, we submit that you can decide

14   this motion, plaintiff's motion for summary judgment, on that

15   basis.  The undisputed -- there is no genuine issue of

16   material fact on the necessary facts to support that claim,

17   and the law provides that Prudential would be entitled to

18   judgment as a matter of law.

19             So with that, we would ask you to grant our motion.

20             As far as the claimant's motion, if I may, I will

21   reserve a short response.

22             THE COURT:  All right.

23             Mr. Deal.

24             MR. PARTRIDGE:  Your Honor, if you would like me to

25   identify better the declaration that you asked, the GoDaddy

1      transcript that you asked about --

2              THE COURT:  Yes.

3              MR. PARTRIDGE:  -- it is Exhibit H to my declaration.

4      It has the Bates Number GD000642.

5              THE COURT:  All right.  Thank you.

6              Mr. Deal.

7              MR. DEAL:  Thank you, Your Honor.

8              I assure you I will keep things -- keep things brief.

9      The case, as the Court knows, has been extensively briefed by

10     both parties, and my client believes that we've included all

11     the relevant information for consideration for the Court in

12     the brief.

13             That said --

14             THE COURT:  Your client is Frank Zhang?

15             MR. DEAL:  And Shenzhen Stone, Your Honor.

16             THE COURT: All right.  Go ahead, sir.

17             MR. DEAL:  Your Honor, fundamentally, the kind of the

18     overarching facts, undisputed facts of this case are that

19     Shenzhen Stone purchased the domain for 100,000 U.S. dollars

20     in 2017.  That number alone doesn't mean anything, but it --

21             THE COURT:  From whom?

22             MR. DEAL:  I don't have that information in front of

23     me, but it is the original registrant that registered the

24     domain in 1997.

25             THE COURT:  You don't know who that is?

1                    MR. DEAL:  I can find it in the --

2                    THE COURT:  Do you know, Mr. Partridge?

3                    MR. PARTRIDGE:  Your Honor, we understand -- we

4       believe the record shows that it was purchased through

5    Sedo from a broker.  That is what we understand.  I can't verify

6    that it was purchased from the original registrant.

7                    THE COURT:  Well, who was the original registrant?

8       Mr. Deal, do you know?

9                    MR. DEAL:  No, sir.

10                   THE COURT:  Do you know, Mr. Partridge?

11                   MR. PARTRIDGE:  Your Honor, it was a company in Texas

12      that used the initials PRU for its business.

13                   THE COURT:  I don't understand.  A Texas company

14      registered the domain name?

15                   MR. PARTRIDGE:  That was the initial registration,

16      yes, Your Honor.

17                   THE COURT:  And who was the Texas company?

18                   MR. PARTRIDGE:  Well, the initials were PRU.  I don't

19      recall the specific name of the company.  But it was the

20      company's initials, and it was in a very different line of

21      business.  It used it apparently for a while and then stopped

22      using it.

23                   THE COURT:  All right.  Go ahead, Mr. Deal.

24                   MR. DEAL:  Your Honor, the fact -- the fact that

25      Shenzhen Stone, the claimant, purchased the domain name for a

1    hundred thousand dollars isn't in itself indicative, you

2    know, alone.  But the undisputed facts in this case are that

3    Shenzhen Stone fairly recently, 2017, purchased the domain

4    name.  From the time it purchased the domain name, it

5    repeatedly engaged in activity consistent with operating a

6    business.  Shenzhen Stone is in the business of Forex, which

7    is financial forecasting and economic advice.

8    Their -- Shenzhen Stone is not an individual without any kind

9    of assets or track record of operating -- starting and

10   operating businesses

11         THE COURT:  I thought you told me Shenzhen Stone is a

12   company, not a person.

13         MR. DEAL:  It is, Your Honor.

14         THE COURT:  All right.  Is there anything in this

15   record that reflects the actual contract for the sale from

16   the Texas company to your client?

17         MR. DEAL:  I don't believe so, Your Honor.  I take

18   one step back.  I think there might be -- there might be a

19   gap in between -- in the chain of custody from the domain

20   name from the original company, whose acronym -- if the Court

21   wants it, it's in my notes, I can find it.  But the original

22   company that utilized the domain name, the acronym was PRU.

23   "P" stood for something, "R" stood for something, "U" stood

24   for something, not related to the plaintiff's line of

25   business.

```
1              THE COURT:  All right.  Go on.
2              MR. DEAL:  So Shenzhen Stone has a well established
3      track record of being in the Forex business.  They operate
4      other websites.  They offer services.  Specifically, in this
5      case, in less tan 10 years, Shenzhen Stone, they offer
6      services that they call News Flash.  They offer something
7      called Calendar on Finances.  They quote marketplaces.  In
8      this case, in the period of time in between -- they
9      purchased -- the time that they purchased the domain name and
10     this present action was initiated, they had hired a third
11     party to develop 20 videos, to be made available to viewers
12     on the website.  They --
13             THE COURT:  This is all in the deposition of
14     Mr. Zhang?
15             MR. DEAL:  It is, Your Honor.
16             THE COURT:  All right.  Go on.
17             MR. DEAL:  And not only that --
18             THE COURT:  When you make these assertions, it would
19     be helpful if you remind me that they're in the record and
20     how.
21             MR. DEAL:  Yes, sir.
22             THE COURT:  Go ahead, sir
23             MR. DEAL:  And not only did they have a -- conceive
24     of what pru.com would be -- how it would be used, but
25     they -- they enacted an entire plan.  They hired cloud
```

1    services through Alibaba Cloud.  They hired a company called

2    Wei Yuan Tuzhi Network to produce those videos.  Twenty

3    videos were finished.  Just prior to this present action,

4    they posted on pru.com a go-live date for their content.

5            Taken from, you know, a 30,000-foot high level, this

6    is not -- this is not the action -- these are not the actions

7    of someone who fits the description of the ACPA -- the type

8    of entity or individual the ACPA is trying to deter.  The

9    ACPA fundamentally is about someone, whether or not it is an

10   entity or an individual, using the free-for-all -- less so

11   now, but more so in years past -- the free-for-all and kind

12   of the unregulated availability of some domain names to abuse

13   the system.

14           Shenzhen Stone is not a cyber squatter.

15   They -- they, like I suppose any large sophisticated

16   business, they want to be -- they want to take advantage of

17   the landscape as much as they possibly can.  To most

18   companies, that includes securing your place online,

19   especially for a company that is going to be based or was

20   based in China, the most populous country on earth.  They

21   want to make sure that they're not limited to -- even present

22   or in the future -- limited to one or two or three domains.

23           We have briefed the kind of sub-subject matter of the

24   inherent value of a three-letter domain.  It has inherent

25   value above what the letters spell or mean.  My client,

1    when they purchased the pru.com name, had that in mind. Even

2    further back, for the plaintiffs to prevail, they need to

3    demonstrate that my client did not believe or was not

4    reasonable in -- in his belief that his purchase and use of

5    the domain was fair and it was a fair use of that domain.  It

6    is undisputed in the testimony of my client and the record to

7    date that my client had no knowledge of Prudential, none.

8    That means the company and Mr. Zhang had no idea Prudential

9    existed as a company, let alone it was spelled in the way

10   that it was spelled, it had any kind of claim to copyright or

11   any kind of claim to trademark --

12           THE COURT:  Well, once your client registered the

13   domain name, it knew that there was another claimant or

14   another user of Pru because it appeared on the blank page.

15   All they had to do was click it.

16           MR. DEAL:  I'm unsure what you mean by a blank page.

17           THE COURT:  When your client registered Pru with

18   GoDaddy, then there was a page prepared in accordance with

19   the contract.  You're familiar with that; aren't you?

20           MR. DEAL:  I am.

21           THE COURT:  You've seen the page, I'm sure.

22           MR. DEAL:  I have.

23           THE COURT:  And you've seen that the page has

24   Prudential Insurance Company on it.

25           MR. DEAL:  Well, that might be, Your Honor.  I'm

1    asserting that prior to purchasing -- prior to purchasing the

2    domain name, my client had no knowledge the Prudential

3    Company existed at all, let alone had ownership of some

4    trademarks outside of the United States, which it doesn't.

5              THE COURT:  You know, it's interesting to me, I take

6    your point that your client is from China, but if anybody in

7    this country, or Europe I think, were to buy a domain name or

8    a trademark, the first thing that person would do before

9    spending money to buy a domain name or trademark is to see

10   whether someone else owns that trademark, trade name, or

11   domain name.  You do work.  You look.  And I take it that

12   never happened in this case; is that right?

13             MR. DEAL:  I can't speak to that, Your Honor.

14             THE COURT:  Well, he was deposed, and I'm wondering

15   whether he was asked that.

16             MR. DEAL:  I don't believe so.

17             THE COURT:  That's the first thing I'd ask him.

18             Mr. Partridge, you didn't ask him that?

19             MR. PARTRIDGE:  Your Honor, we didn't actually have

20   to ask him that because he says in his declarations,

21   remarkably, that he paid a hundred thousand dollars for the

22   domain name and did no search or investigation regarding the

23   name.

24             THE COURT:  Well, then the next question would be:

25   Why?

1          All right.  That was just my curiosity, Mr. Deal.

2     That answered it fully.  Thank you.

3          Proceed.

4          MR. DEAL:  And Your Honor, just further on the -- I

5     mean the plaintiff's entire argument is based upon the

6     allegation that my client acted in bad faith.  And I'll --

7     I'll get to some of that -- I won't go over all nine of them,

8     but I will respond to some of the finer points that plaintiff

9     made.

10         THE COURT:  Fine.  Why don't we do it now since it's

11    after lunch.  I don't want to stop you from saying anything.

12    Mr. Deal, if you think something is important, never mind

13    lunch.

14         MR. DEAL:  Your Honor, I'm in agreement.  As I

15    stated, I think the case or the matter before you has been

16    well briefed.

17         THE COURT:  It has.

18         MR. DEAL:  Specifically, factor -- well, before I get

19    to factor five -- I'm not quite sure where these fit on the

20    points -- but the plaintiff's idea that GoDaddy in the -- my

21    client should be charged with engaging in commerce, let alone

22    offering the -- the domain name for sale by registering the

23    domain name with GoDaddy, who has a -- who employs a

24    form-holding page for domains that lack code and content

25    uploaded to them is preposterous.  Every web hosting company,

—34—

1    to my knowledge, that ever existed has a page that is similar

2    to what is being described in this case.  If you go to any

3    holding page, GoDaddy or any web hosting company, they're

4    going to have a variation of:  Would you like this domain

5    name?  That's what we get when we go to websites that either

6    have been taken down or have been reserved  for -- for future

7    content by --  by an individual or entity.

8            My client is certainly not charged

9    with -- with -- with offering for sale the web domain based

10   on -- based on GoDaddy's template that they use for a holding

11   page.  The record indicates that his actions and Shenzhen

12   Stone's actions are the exact opposite; that, number one,

13   there's been no -- there's no evidence at all of proactive

14   seeking to sell this name, and when Shenzhen Stone was

15   offered and asked about a cost or asked to sell the domain,

16   it refused.

17           Going back to the $100,000 that the claimant paid for

18   the domain name, in this context, I would argue that weighs

19   against what the plaintiff is asserting and that he is -- he

20   fits the description of a cyber squatter or someone that is

21   in it to exploit the rules of buying a domain name.  I'm no

22   expert on what domain names go for, but to make his endeavor

23   worthwhile, he would have had to recover the cost of buying

24   the domain name for $100,000, which curiously enough in the

25   past 20 years was never -- never originally or subsequently

1    purchased --

2            THE COURT:  Tell me again who he paid the $100,000

3    to.

4            MR. DEAL:  I don't know the name, Your Honor.  It

5    was -- it was a -- and I don't think -- either counsel, we're

6    not sure the exact chain of custody, but it was originally

7    purchased and used for a business entity whose acronym was

8    PRU, and then there may have been some kind of gap in between

9    the end use of the original buyer and the owner of the domain

10   name that ultimately sold it to --

11           THE COURT:  Apart from your client's testimony in his

12   deposition presumably, what proof is there that he did

13   actually pay $100,000 to some company for this?

14           MR. DEAL:  I don't know the answer to that question,

15   Your Honor.

16           THE COURT:  All right.  Go ahead.  Finish your

17   argument.

18           MR. DEAL:  So in order for my client to get any kind

19   of benefit to the actions that he's been accused of, he would

20   have had to recover his $100,000 for buying the name, he

21   would have had to recover his -- his expenses and his time

22   and his manpower that he expended on hiring a production

23   company, hiring -- hiring the web servers, hiring the

24   employees that he has testified to employ -- that he

25   employed.  This is -- these are frankly not facts that fit

1    with the type of individual or entity that the ACPA was

2    designed to prevent.

3            On that same note, on factor five, the idea

4    that -- well, it's an undisputed fact in the record based

5    on -- based on the deposition transcript that Mr. Zhang was

6    only aware of what holding page came up to Chinese users, to

7    users in mainland China.  There is a very big difference

8    between what Chinese-based viewers see on the holding page

9    and what U.S. viewers viewed on the holding page.  They were

10   different pages.  Plaintiff wants to charge my client with

11   being aware of every single variation of holding page from

12   any spot on the globe.  My client is a Chinese-only business

13   who operates multiple businesses in China, not in the United

14   States.  He doesn't operate anywhere else.  And to his

15   knowledge, when he -- when he went to the holding page, there

16   was to become -- pru.com website, he saw a holding page that

17   bears no resemblance at all to what the client is describing

18   existed to U.S. customers.  U.S. viewers and U.S. customers

19   were not the target audience of my client's business and,

20   therefore, bear -- little to no bearing at all on the

21   argument.

22           I touched on it a little bit before, but there is

23   nothing in the record other than my client being contacted by

24   a third party with GoDaddy referencing -- referencing a

25   potential offer to sell the domain name.  There was no price

1    listed, no individual name, no entity name, there was no

2    offer made. That is consistent with my client's testimony in

3    his deposition that states he didn't want to sell it.  Not

4    only he didn't want to sell it, that's not why he purchased

5    it.  And the notion -- the notion that any businessman or

6    woman of any kind wouldn't or should be charged with -- with

7    across-the-board refusing to entertain any kind of offer ever

8    on -- on an asset of the company -- in this case, it is a

9    website -- is preposterous.  That is certainly not the

10   standard.  Any smart businessman of any quality would be open

11   to listening to an offer of any kind about any kind of asset.

12   Plaintiff here wants to inform the Court that there was an

13   offer made by a third party about nothing specific, and

14   therefore, you can attribute some kind of intent to my

15   client.

16          And Your Honor, the only other -- the only other

17   factor of the nine that I wanted to touch on is just respond

18   a little bit to the plaintiff's charge of providing some kind

19   of misleading contact information.

20          Everyone knows that when you sign up for a website,

21   when you purchase a website, you have the option at the time

22   of registration, at the time of transfer, to decide whether

23   or not you want that information to be publicly displayed or

24   not.  When an entity decides that they don't want to make

25   their registration information public -- and I'm speaking

1    from personal experience -- I have a commercial website --

2    most businesses cannot run without one --

3              THE COURT:  I don't need to hear your testimony

4    today.  If it's in the record, I will listen.  Otherwise,

5    your personal experience really isn't relevant.

6              MR. DEAL:  The choice -- the choice of a domain name

7    owner to make registrant information private or public is a

8    simple, straightforward decision based on -- based on nothing

9    having to do with one of these factors.  My client did not

10   use any kind of alias, he did not use any kind of misleading

11   information with the information with ICAN and with GoDaddy.

12   He used the the Bailun holding company's name and his own

13   name in the information that was listed with the ownership of

14   the domain.

15             Your Honor, that's all I have now.

16             THE COURT:  All right.  Do you have a very brief

17   response?

18             MR. PARTRIDGE:  Yes, Your Honor.  I will try to be

19   very brief.

20             Most of these points we've covered already.  As a

21   matter of law, the alleged use in China isn't relevant to the

22   ACPA claim.  That's the contention under *Harrods*.  *Harrods*

23   says that.  If you agree with that position, then it's easy

24   to grant the summary judgment motion.  If we have to look at

25   the alleged evidence for use in China, that's very

1          interesting.  It's primarily Zhang saying it's so.  It relies

2          on his credibility and intent.  But what's interesting is

3          what's missing from the record.  It says we were working on

4          this for a long time.  There are no business plans.  There

5          are no budgets in the record.  There's no reports from the

6          various employees he said who were working on it over time.

7          There is a handful of questionable documents.  Some are not

8          original documents.  Some are unofficial translations.  It's

9          not clear what they're dealing with.  Zhang says it's

10         pru.com, but you would expect there to be more that could be

11         presented if that were true.  So there is not enough evidence

12         to support the alleged use.  What the evidence suggests --

13         and in denying their motion for summary judgment, we would be

14         entitled to these inferences -- is that they were holding

15         this name.  This is -- well, why would he refuse an offer?

16         He might refuse an offer because the offer was not high

17         enough, he was waiting for a higher offer.  And as a person

18         who owns 400 domain names, they know the rules.  But the

19         evidence that's in -- in the record, it's not clear when it

20         was created, but some of the evidence is clear.  One of the

21         things that happened after the UDRP action was presented is

22         Mr. Zhang presented a mock-up of a website.  That mock-up was

23         essentially the same in appearance.  It had differences, but

24         it was very similar to a website that had the Bailun name.

25         It is essentially a skin or a shell which they populated with

1    financial information from *Bloomberg* and Reuters.  One day

2    the Bailun website goes down.  The next day Mr. Zhang or

3    claimant purchases a static IP address.  That is an IP

4    address that doesn't resolve to a domain name.  But they

5    purchase it the next day -- this is after the UDRP dispute

6    started -- and populates that website -- now, changes where

7    Bailun is and puts on pru.com.  There is reason to believe in

8    the record that this was a pretext, and on their motion for

9    summary judgment, we would be entitled to those inferences.

10   They're reasonable, and they're supported by the facts

11   presented from their own submissions and from the -- the

12   record of when that static IP address was purchased.

13            THE COURT:  All right.  Thank you.

14            MR. PARTRIDGE:  These things are, in somewhat more

15   detail, laid out in the declarations.

16            THE COURT:  All right.  I thank you for your

17   arguments.

18            MR. PARTRIDGE:  Thank you, Your Honor.

19            THE COURT:  You're from Chicago; aren't you?

20            MR. PARTRIDGE:  I am, Your Honor, yes.

21            THE COURT:  I'm an old man, so I reminisce a lot.

22   Many years ago when I first came to this country, I went to

23   Chicago.  That's the first place I went to, as I recall.  And

24   I was called a spick because I had dark hair and I spoke

25   Spanish.  I lived in Cicero, Illinois.  I delivered the

1    *Cicero Life* and the Chicago Tribune to ladies who wore

2    babushkas and did not speak English.  And I became a Chicago

3    Cubs fan.  I never went to a Chicago game, so I would not

4    have had any reason to celebrate.  But life is strange with

5    these coincidences.  A few years ago, maybe two years ago or

6    maybe a year and a half ago a young man appeared in my

7    courtroom.  He was a prosecutor, Assistant U.S. Attorney, his

8    name was Terwilliger.  I said, "Oh, Mr. Terwilliger, you're

9    not by any chance related, are you, to Wayne Terwilliger?"

10   Wayne Terwilliger was a second baseman for the Chicago Cubs,

11   not a very good one because there weren't any good players on

12   the Chicago Cubs team.  I will be darn if this young

13   Mr. Terwilliger didn't say, "Yeah, I am related to him.  He

14   is my great-great uncle."

15           And I said, "Well, is he still living?"

16           He said, "Yes, he is, he's 96."

17           I said, "Well, please pass on to him that he has a

18   fan who's not quite that old yet," and he did.

19           And then my son married a woman who is a rabid

20   Chicago Cubs fan, even goes to Chicago for games even though

21   she lives in Virginia.

22           So I subjected you to some recollections on my part,

23   and I actually have spent time in Crozet.  My wife used to

24   teach at Western Albermarle High School, which is in Crozet.

25   And it is a very pretty spot.  And it's nice to be able to

```
 1           live in Crozet.  But you work downtown?

 2                   MR. DEAL:  I do.

 3                   THE COURT:  But you're smart enough to live out in

 4           Crozet.

 5                   MR. DEAL:  I have a home in both places.

 6                   THE COURT:  You have a home --

 7                   MR. DEAL:  A home in both places.

 8                   THE COURT:  Both places.  Well, you're lucky.  I

 9           worry that the place is getting too heavily populated now.

10           But we moved to Charlottesville because my wife is what

11           Mr. Deal knows as a Triple Hoo.  She's a graduate three times

12           of the University of Virginia.  I have nothing to do with the

13           University of Virginia except I knew lots of people.  And my

14           wife put a brick in Emerson Spies' garden.

15                   Are you a UVA law graduate?

16                   MR. DEAL:  Not law; undergrad.

17                   THE COURT:  Emerson Spies was the dean of the law

18           school and a good friend, so my wife got a brick there with

19           my name on it, and has a dog go in there once a month to

20           christen it to make sure I remain humble.

21                   Thank you all for making this trip today.  And

22           Mr. Deal, you may tell your colleague from New York that --

23           we didn't miss him; did we?

24                   MR. DEAL:  I'll communicate that, Your Honor.

25                   THE COURT:  All right.  Have a safe drive back, and
```

1          you have a safe flight back.

2                    Is your colleague also from Chicago?

3                    UNIDENTIFIED SPEAKER:  No, Your Honor.  I'm from

4          Arlington.

5                    THE COURT:  You're here.  Okay.

6                    Yes, I remember the Cubs in those days.  You remember

7          Hank Sauer, Wayne Terwilliger, Dee Fondy, Phil Cavarretta --

8                    MR. PARTRIDGE:  I recognize some of those names, but

9          I'm a latecomer to Chicago.  I moved there in the eighties.

10                    THE COURT:  The world had changed.

11                    MR. PARTRIDGE:  A bit of a change.

12                    THE COURT:  Well, I lived in Al Capone's -- not only

13          his town, but I lived at 3541 South Allston Boulevard, which

14          is out past Morton High School, if you know where that is.

15                    Thank you all.  I will take your arguments under

16          advisement, including the thorough briefing that you had, and

17          you'll hear from me.  Thank you.

18                    (Proceedings adjourned)

19

20

21

22

23

24

25

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3       I, Patricia A. Kaneshiro-Miller, certify that the foregoing

4  is a correct transcript from the record of proceedings in the

5  above-entitled matter.

6

7

8  /s/ Patricia A. Kaneshiro-Miller            June 7, 2021
   ------------------------------------    ----------------------
9  PATRICIA A. KANESHIRO-MILLER                      DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25