## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA<br>Plaintiff,<br><br>v.<br><br>PRU.COM, *a domain name*<br>Defendant. | )<br>)<br>)<br>)<br>)  Civil Action No. 1:20-cv-450<br>)<br>)<br>)<br>) |

### MEMORANDUM OPINION

At issue in this *in rem* anti-cybersquatting and trademark infringement action are cross-motions for summary judgment by Plaintiff Prudential Insurance Company of America ("Prudential") and Claimant Shenzhen Stone Network Information Ltd. ("SSN").  The subject *res* is the PRU.COM domain name, which SSN purchased and registered in October 2017 from an unidentified Texas company not affiliated with either Prudential or SSN.  The questions presented on summary judgment are:

> (1) for Count 1, a cybersquatting claim, whether SSN registered the PRU.COM domain name with a bad faith intent to profit such that this website must be transferred from SSN to Prudential pursuant to 15 U.S.C. § 1125(d)(1)(C);[1] and

> (2) for Count 2, a trademark infringement claim, whether SSN made "use" of Prudential's PRU trademark "in commerce"[2] such that this website must be transferred from SSN to Prudential pursuant to 15 U.S.C. § 1125(d)(1)(C).

---

[1] Section 1125(d)(1)(C) permits a district court in an anti-cybersquatting or trademark infringement action "to order the forfeiture or cancellation of the domain name or transfer of the domain name to the owner of the mark." 15 U.S.C. § 1125(d)(1)(C).  The parties' summary judgment briefing correctly does not request any other additional remedies (such as monetary damages), as the sole relief available in an *in rem* action is transfer of the domain name. *See* 15 U.S.C. § 1125(d)(2)(D)(i) ("The remedies in an *in rem* action under this paragraph shall be limited to a court order for the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark."); *see also Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 232 (4th Cir. 2002) (same).

[2] 15 U.S.C. § 1114(a).

The questions presented on summary judgment have been fully briefed and argued, including a telephonic hearing that occurred on April 23, 2021.  Accordingly, the questions presented on summary judgment are now ripe for disposition.

## I.

The following summary of (A) the prior proceedings and (B) the undisputed record facts are pertinent to the resolution of this matter on summary judgment.[3]

### A. Prior Proceedings

- Prudential is a U.S. insurance and financial services company that operates worldwide.

- SSN is a Chinese internet company that distributes financial and economic information to Chinese consumers, with a focus on the foreign exchange industry.

- Frank Zhang, a Chinese citizen, is the CEO of SSN.  Zhang, on behalf of SSN, is responsible for the registration and management of the PRU.COM domain name.

- SSN currently owns the PRU.COM domain name.  Zhang purchased the PRU.COM domain name at the behest of SSN on October 17, 2017 through SEDO.COM, a website for purchasing domain names.  The PRU.COM domain name had previously been owned by an unidentified Texas company.  Zhang claims that SSN paid $100,000 for the PRU.COM domain name.

- GoDaddy, located in Arizona, is the domain name registrar for PRU.COM.  Verisign, located in Virginia, is the domain name registry for PRU.COM.

- On March 25, 2020, Prudential filed an action with the World Intellectual Property Organization ("WIPO") regarding the PRU.COM domain name.

- On March 27, 2020 WIPO informed Prudential that the Registrant Name for the PRU.COM domain name was Frank Zhang and that the Registration Organization was Bailun, another Chinese company owned or controlled by Zhang.

- On March 30, 2020 WIPO locked the PRU.COM domain name such that it could not be edited or revised pending the outcome of litigation.

---

[3] To dispute a fact on summary judgment, the opposing party must "include a specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated and citing the parts of the record relied on to support the facts alleged to be in dispute.  In determining a motion for summary judgment, the Court may assume that facts . . . are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." Local Rule 56(B), U.S. District Court for the Eastern District of Virginia.

- On April 22, 2020, Prudential filed this action against the PRU.COM domain name and Zhang.  The Complaint alleges two claims, namely:

    o  (1) a cybersquatting claim under the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d); and

    o  (2) a trademark infringement under the Lanham Act, 15 U.S.C. § 1114.

- On May 7, 2020, upon Prudential's motion, the WIPO proceedings were terminated.

- On July 22, 2020, a Memorandum Opinion issued that dismissed Zhang as a defendant, for want of personal jurisdiction, but permitted this action to proceed *in rem* against the PRU.COM domain name pursuant to 15 U.S.C. § 1125(d)(2).[4]

- On March 26, 2021, Prudential filed a Motion for Summary Judgment on Counts 1 and 2, seeking transfer of the PRU.COM domain name from SSN to Prudential.  On March 27, 2021, SSN filed a Cross Motion for Summary Judgment on Counts 1 and 2, seeking dismissal of this action in its entirety.

### B. Undisputed Record Facts

- The parties agree that Prudential owns U.S. trademark registrations for "PRUDENTIAL," "PRU," and PRU-related marks.[5]

- The record establishes that Prudential has trademarked the term "PRU" in other countries or territories, including Argentina, Bolivia, Brazil, Canada, Chile, Colombia, Costa Rica, Cuba, El Salvador, Guatemala, Haiti, Honduras, Japan, Mexico, North Korea, Panama, Paraguay, Peru, South Korea, Taiwan, Uruguay, and Venezuela.[6]

- The parties agree that although Prudential, through its joint venture partners, markets its products in mainland China, Prudential does not use PRU or PRU-formative marks in mainland China.  Instead, another insurance company not affiliated with Prudential uses a PRU mark in mainland China.

---

[4] *See Prudential Ins. Co. of Am. v. PRU.COM*, No. 1:20-cv-450, 2020 WL 4208447, at *7 (E.D. Va. July 22, 2020).

[5] *See, e.g.*, Trademarks for PRUDENTIAL, Reg. No. 693628 (registered Feb. 23, 1960), PRU-MATIC, Reg. No. 1481897 (registered Mar. 22, 1988), PRUCHOICE, Reg. No. 2120636 (registered Dec. 9, 1997), PRULIFE UNIVERSAL, No. 2528657 (registered Jan. 8, 2002), PRUDENTIAL.COM, Reg. No. 2549502 (registered Mar. 19, 2002), PRULIFE, Reg. No. 2583811 (registered June 18, 2002), PRUDENTIAL FINANCIAL, Reg. No. 2646315 (registered Nov. 5, 2002), PRU, Reg. No. 2654445 (registered Nov. 26, 2002), PRUSAFE, Reg. No. 2856647 (registered June 22, 2004), PRUXPRESS, Reg. No. 3624170 (registered May 19, 2009), PRUNOW, Reg No. 5242815 (registered July 11, 2017), PRUFAST TRACK, Reg. No. 5376402 (registered Jan 9, 2018), PruUMA, Reg. No. 5397894 (registered Feb. 6, 2018), PRUDENTIAL ADVISORS ONSITE, Reg. No. 5639808 (registered Dec. 25, 2018) (trademarks available at Dkt. 83-1).

[6] *See* Lazzaro Decl. Ex. B (Dkt. 90-1) (list of Prudential trademark records by country).

- The parties agree that Prudential owns and uses several internet domain names, including prulife.com.tw, pru.com.tw, and the DOT.PRU top level domain name.

- The parties agree that, on the N.Y. Stock Exchange, Prudential's stock ticker is PRU.

- The parties agree that SSN owns what appears to be over 100 different domain names, including domain names that include the terms "yelp," "quora," and "chrome." For example, SSN owns forexyelp.com, forexyelp.org, fxyelp.com, forexquora.org, forexquora.com, fxquora.com, forexchrome.com, and forexchrome.org. [7]

- No party disputes that Yelp and Quora are distinctive marks and that Chrome is the web browser developed and owned by Google. It is appropriate to take judicial notice that Yelp is a popular internet restaurant review service, that Quora is a popular internet question and answer service, and that Chrome is a popular web browser. [8]

- The parties agree that, since SSN's acquisition of the PRU.COM domain name, SSN has never uploaded any viewable content or material to this website.

- The parties agree that, since SSN's acquisition of the PRU.COM domain name, an internet user who visits PRU.COM has always seen a GoDaddy Parked Page.

  o Specifically, an internet user in the United States who visits PRU.COM sees a page similar to the following, which includes (1) pay-per-click hyperlinks that display Prudential's marks and the marks of other U.S. insurance companies and (2) the phrase "Would you like to buy this domain?"



---

[7] *See* Partridge Decl. Ex. L at 94–106 (Dkt. 90-7) (list of SSN's domain name).

[8] Apple App Store Preview, Yelp Food, Delivery & Services, https://apps.apple.com/us/app/yelp-food-delivery-services/id284910350 (noting that Yelp is the fourth ranked Food & Drink application in the Apple App Store and that over 400,000 people have reviewed the Yelp App) (last accessed June 30, 2021); Apple App Store Preview, Quora, https://apps.apple.com/us/app/quora/id456034437 (noting that Quora is the ninth ranked News application in the Apple App Store and that over 130,000 people have reviewed the Quora App) (last accessed June 30, 2021); The Brower Built by Google, Google Chrome, https://www.google.com/chrome/ (last accessed June 30, 2021).

*See* Giger Decl. Ex. A (Dkt. 84-1).

- o Similarly, an internet user in China who visits PRU.COM will see a GoDaddy Parked page that resembles the following:



*See* Zhang Decl. ¶ 41 (Dkt. 96).

- The parties agree that the term "PRU.COM" is identical to Prudential's PRU mark, if the .COM in PRU.COM is ignored.

- The record establishes that SSN expressed an interest in selling the PRU.COM domain name. Specially, the record establishes that, between March 10, 2020 and March 30, 2020, in response to an offer from another person to purchase the PRU.COM domain name from SSN, SSN instructed a GoDaddy Representative, by telephone, to respond to the offer as follows:

  - o (1) SSN would only consider an offer in the "six figure" range but also that the website was not for sale;

  - o (2) SSN wanted to know the buyer's location and line of business; and

  - o (3) SSN would quote a price upon SSN's analysis of the buyer's information.[9]

- The record establishes that Zhang or SSN used misleading or inaccurate contact information for the PRU.COM domain name. Specifically, the record establishes:

  - o (1) that on October 13, 2017, the name for Zhang's GoDaddy account was "shi wan," not Frank Zhang;

  - o (2) that on March 23, 2020, the contact information for the PRU.COM domain

---

[9] Partridge Decl. Ex. H at 2–5 (Dkt. 90-5).

name on the GoDaddy WhoIs website was "Registration Private";

- o (3) on March 27, 2020, WIPO informed Prudential that the Registrant Name for the PRU.COM domain name was Frank Zhang and that the Registration Organization was Bailun, not SSN;

- o (4) that on March 30, 2020, the name for Zhang's GoDaddy account changed from "shi wan" to "zhaoyuan"; and

- o (5) that on April 9, 2020, the name for Zhang's GoDaddy account changed from "zhaoyuan" to "zhaoyuan zhang."[10]

- The parties agree that SSN has no trademark or intellectual property rights in PRU.COM.

- The parties agree that SSN's legal name is not PRU and that SSN is not commonly known as PRU.

- The parties agree that SSN did not make noncommercial or fair use of the PRU mark for parody, comment, criticism, comparative advertising, or news reporting.

- SSN asserts that SSN plans to develop the PRU.COM domain name into a website or product covering foreign exchange and economic news. The parties, however, agree that SSN has never uploaded any viewable content or material to the PRU.COM website, despite having acquire the website in October 2017.

- SSN appears to allege that this website or product was set to launch on March 30, 2020,[11] which, interestingly, is the day that WIPO locked the PRU.COM domain name.

---

[10] Giger Decl. Exs. at 9–10, 37, 41–42 (Dkt. 19-1); Partridge Decl. Ex. E. at 9 (Dkt. 90-3)

[11] SSN has submitted into the record what is apparently alleged to be documentary evidence of SSN's incomplete efforts to develop the PRU.COM domain name for launch on March 30, 2020. These documents include (1) a purported three-page contract between SSN and a Chinese company, Wuhan Huzhou Network Technology, to develop videos for the PRU.COM domain name (Dkt. 94-12), (2) a receipt indicating that SSN purchased Cloud Server service for the PRU.COM domain name (Dkt. 94-13), (3) a purported one-page advertisement for the PRU.COM domain name (Dkt. 94-20), (4) a purported page mockup of the PRU.COM website that is dated March 30, 2020 (Dkt. 94-11), and (5) three pages of thumbnail sketches of financial symbols and cartoon-like characters, which SSN claims represent proof of the videos to be uploaded to the PRU.COM domain name (Dkt. 94-10).

None of these materials negates the fact that SSN registered the PRU.COM domain name with a bad faith intent to profit, for SSN never uploaded any of these materials to the PRU.COM domain name. The PRU.COM domain name has consistently appeared as a GoDaddy Parked Page since October 2017. Moreover, as Prudential correctly points out, these documents are somewhat unreliable, as they are authenticated through the declaration of SSN's counsel, who lacks personal knowledge of the substance of the documents and the date of creation. *See Bias v. Moynihan*, 508 F.3d 1212, 1224–25 (9th Cir. 2007) (witness with personal knowledge, not counsel, should typically authenticate documents); *see also Garcia v. Fannie Mae*, 794 F. Supp. 2d 1155, 1162 (D. Org. 2011) (internal citation omitted) ("An attorney's affidavit is treated like all other affidavits pursuant to Rule 56(e) and is not sufficient unless it is based on personal knowledge . . .. Under most circumstances, an attorney has no personal knowledge and is not competent to testify to the authenticity of documents . . . merely produced by his client."). Accordingly, nothing about these

- SSN asserts that the Chinese name for this alleged financial news product is 普鲁社.

- SSN asserts that 普鲁社 is Simplified Chinese for Pǔ Lǔ Shè and (1) that the first two characters mean "Prussia" in English and (2) that the third character means "news agency" or "organization" in English.  SSN also asserts that the short form for Pǔ Lǔ Shè is "p" "r" "u".[12]

- SSN asserts that 普鲁社 is an appropriate name for its financial services product.

## II.

Both parties seek summary judgment on Count 1, a cybersquatting claim under U.S.C. § 1125(d).  To prevail on a cybersquatting claim, a plaintiff must establish: (1) that the party using the domain name "had a bad faith intent to profit from using the [] domain name" and (2) that the domain name "is identical or confusingly similar to, or dilutive of [a] distinctive and famous [] [m]ark." *Newport News Holdings Corp. v. Virtual City Vinson, Inc.*, 650 F.3d 423, 434 (4th Cir. 2011).  Cybersquatting claims may be decided on summary judgment, where, as here, there are no genuine disputes of material fact.  *See Newport News Holdings Corp.*, 650 F.3d at 434–35 (determining the issue of bad faith on summary judgment); *see also Lamparello v. Falwell*, 420 F.3d 309, 322 (4th Cir. 2005) (same).  And importantly, the sole remedy in an ACPA action proceeding *in rem* is transfer of the domain name to the mark holder.  15 U.S.C. § 1125(d)(2)(D).

Because there is no dispute that the second part of this two-part test is met—PRU.COM is clearly confusingly similar to PRU, a trademarked term—the sole and dispositive issue on summary judgment for Count 1 is whether Claimant had a bad faith intent to profit from the

---

materials negates the fact that SSN registered the PRU.COM domain name with a bad faith intent to profit.

[12] In support of these translations, SSN cites solely (1) Zhang's declaration and (2) an 1843 book by Wei Yaun titled *Haiguo Tuzhi (Illustrated Treatise on the Maritime Kingdoms)*, which has not been submitted into the record. SSN's translation, which Prudential sharply disputes but inexplicably does not provide a contrary interpretation, is not a certified translation.  It is also further suspect because Zhang, SSN's CEO, has an interest in the outcome of this litigation.  Thus, it is appropriate to view SSN's proffered translations with some skepticism.  In any event, the parties' dispute over this translation is not material to the result reached here on summary judgment.

PRU.COM domain name.  Analysis of this issue properly begins with Subsection B of the ACPA's cybersquatting provision, stating that a district court "may consider" the following nine factors, namely:

> (1) the trademark or other intellectual property rights of the [alleged cybersquatter], if any, in the domain name;
>
> (2) the extent to which the domain name consists of the legal name of the [alleged cybersquatter] or a name that is otherwise commonly used to identify [the alleged cybersquatter];
>
> (3) the [alleged cybersquatter's] prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
>
> (4) the [alleged cybersquatter's] bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
>
> (5) the [alleged cybersquatter's] intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
>
> (6) the [alleged cybersquatter's] offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the [alleged cybersquatter's] prior conduct indicating a pattern of such conduct;
>
> (7) the [alleged cybersquatter's] provision of material and misleading false contact information when applying for the registration of the domain name, the [alleged cybersquatter's] intentional failure to maintain accurate contact information, or the [alleged cybersquatter's] prior conduct indicating a pattern of such conduct;
>
> (8) the [alleged cybersquatter's] registration or acquisition of multiple domain names which the [alleged cybersquatter] knows are identical or confusingly similar to marks of others that are distinctive at the time of the registration of such domain names, or dilutive of famous marks of others that are famous at the time of

registration of such domain names, without regard to the goods or services of the parties; and

(9) the extent to which the mark incorporated in the [alleged cybersquatter's] domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of this section.

15 U.S.C. § 1125(d)(1)(B)(i).

Although the ACPA instructs courts to consider these nine factors, the Fourth Circuit has emphasized that these nine factors are merely "a guide, not [] a substitute for careful thinking about whether the conduct at issue is motivated by a bad faith intent to profit." *Lamparello v. Falwell*, 420 F.3d 309, 320 (4th Cir. 2005). As a result, "there is no simple formula for evaluating and weighing these factors" and a district court need not "march through them all" or simply "count up which party has more factors." *Id.* The central question is simply "whether or not the [alleged cybersquatter] registered, trafficked in, or used the domain name with a bad-faith intent to profit from the goodwill of the mark of another." *Harrods v. Sixty Internet Domain Names*, 302 F.3d 214, 234 (4th Cir. 2002).

Here, as the following discussion confirms, all nine factors favor Prudential and Prudential's request that the PRU.COM domain name be transferred from SSN to Prudential pursuant to § 1125(d)(1)(C).

### *1. Factor I: SSN has no trademark or intellectual property rights in PRU.COM*

The first of the nine factors—whether SSN has any trademark or intellectual property rights in PRU.COM at the time of registration—clearly favors Prudential. SSN and Zhang simply did not have any such rights at the time of registration, and therefore Factor I favors Prudential. *See Sporty's Farm L.L.C. v. Sportman's Market, Inc.*, 202 F.3d 489, 498 (2d Cir. 2002) (there, Factor I favored the mark holder where the alleged cybersquatter had no property rights in the mark at the time of registration). The record is also clear that neither SSN nor Zhang has any legal right

in the term PRU.  The mere fact that SSN now owns the PRU.COM domain name hardly alters

the analysis, for "registration of the domain name is not sufficient to establish [a qualifying] right"

for Factor I. *Citigroup, Inc. v. Chen Bao Shui*, 611 F. Supp. 2d 507, 511 (E.D. Va. 2009) (there,

Factor I supported a finding of bad faith intent to profit where the cybersquatter's sole alleged

property right was the domain name itself).  Indeed, if registration of a domain name itself

established a qualifying right under Factor I, then Factor I would favor the cybersquatter in every

single case.  Surely, Congress did not intend such a result in passing the ACPA.  Accordingly,

Factor I clearly favors Prudential and thus the transfer of the PRU.COM domain name to

Prudential.

### 2.  *Factor II: SSN is not known as PRU*

The second of the nine factors—whether SSN's legal name is PRU or whether SSN is

commonly known as PRU—also clearly favors Prudential.  SSN is not legally registered or

commonly known as PRU.  *See Citigroup*, 611. F. Supp. 2d at 511 (there, Factor II supported a

finding of bad faith intent to profit where the alleged cybersquatter was not legally or commonly

known by the domain name).  Accordingly, Factor II clearly favors Prudential and thus the transfer

of the PRU.COM domain name to Prudential.

### 3.  *Factor III: SSN has not previously used PRU.COM for any bona fide commercial offering of goods or services*

The third of the nine factors—whether SSN used the PRU.COM domain name prior to this

action for any *bona fide* commercial purpose—clearly favors Prudential.  This is so because SSN

did not develop the PRU.COM domain name beyond a GoDaddy Parked Page, despite having

ample time to do so.  SSN's pay-per-click advertising on the U.S. version of the PRU.COM domain

name is hardly a *bona fide* commercial offering of goods or services, and several district courts

have reached this sensible conclusion.  *See Purtetalk Holdings, Inc. v. Puretalk.com*, No. 1:19-cv-

1532, 2020 WL 6922651, at \*4 (E.D. Va. Sep.18, 2020) (pay-per-click advertising is not *bona fide* commercial use); *see also Opt Out Serv., LLC Optoutprescreened.com*, No. 1:19-cv-6076, 2019 WL 7340748, at \*3 (E.D. Va. Oct. 4, 2019) (same).

SSN's claim that SSN intends, or intended, to develop the PRU.COM domain name does alter this conclusion.  Factor III, by its terms, concerns the alleged cybersquatter's "*prior use*, if any, of the domain name in connection with a bona fide offering of [] goods or services" 15 U.S.C. § 1125(d)(1)(B)(i)(III) (emphasis added).  As the Sixth Circuit has explained:

> It is irrelevant that [the alleged cybersquatter] states that he intends to add *bona fide* goods or services to the site eventually since [] factor [III] asks whether the domain name holder has actually used the site in connection with the offer of goods or services, not whether the domain holder intends to do so.

*DaimlerChrysler v. The Net Inc.*, 388 F.3d 201, 207 n.3 (6th Cir. 2004).

Thus, under settled authority, the fact that SSN intends, or intended, to develop the PRU.COM domain name is irrelevant under Factor III.  As a result, the alleged evidence of SSN's efforts to develop the PRU.COM domain name—much of which is interestingly dated March 2020, the month Prudential contacted SSN about the PRU.COM domain name—does not alter the result reached here under Factor III.  Accordingly, Factor III clearly favors Prudential and thus the transfer of the PRU.COM domain name to Prudential.[13]

### 4. *Factor IV: SSN has not previously used PRU.COM for any non-commercial or fair use purpose*

The fourth of the nine factors—whether SSN used PRU.COM prior to this action for any

---

[13] Seeking to interpret Factor III to refer to future intended use, SSN misconstrues *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 234 (4th Cir. 2002).  There, the Fourth Circuit stated that legitimate plans of future use are relevant to the bad faith inquiry "where [the] domain name registrant has a longstanding history of using [the] trademark."  *Harrods*, 302 F.3d at 234.  Quite clearly, *Harrods* is factually distinguishable; there, unlike here, the alleged cybersquatter was a "decades-old company" that was "commonly known" as the domain name and earned at least $300,000 in annual revenue.  *Id.* at 235.  Here, SSN is not a decades-old company, is not known as PRU, and has submitted no record evidence of any company revenue.

non-commercial or fair use purpose—clearly favors Prudential. It is undisputed that Prudential has never used PRU.COM for any non-commercial or fair use purpose. Accordingly, Factor IV clearly favors Prudential and thus the transfer of the PRU.COM domain name to Prudential.

### 5. Factor V: SSN's intent in registering PRU.COM was to divert customers away from Prudential

The fifth of the nine factors—whether SSN's intent in registering the PRU.COM domain name was to divert customers away from Prudential—clearly favors Prudential. Importantly, Factor V "is rarely discernable directly, [and] must typically be inferred from the pertinent facts and circumstances." *Audi AG v. D'Amato*, 469 F.3d 534, 549 (6th Cir. 2006); *Carnivale v. Staub Design LLC*, 547 F. App'x 114, 116 (3rd Cir. 2013) (same). The pertinent circumstantial evidence here makes clear that SSN purchased and registered the PRU.COM domain name in order to divert customers away from Prudential so that Prudential might then be willing to offer a substantial sum—six figures—to halt this diversion.

The first piece of circumstantial evidence in this respect is the fact that PRU.COM is identical to Prudential's PRU mark. Congress passed the ACPA against the background of a "proliferation of cybersquatting—the Internet version of a land grab," *Southern Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d 1235, 1246 (11th Cir. 2009), and thus the similarity between PRU.COM and Prudential's PRU mark supports a finding of bad faith intent to profit under Factor V. Instructive in this regard is the Sixth Circuit's decision in *DaimlerChrysler v. The Net Inc.,* 388 F.3d 201 (6th Cir. 2004). There, the Sixth Circuit noted that an intent to divert "can be inferred" where the domain name is "phonetically identical to the plaintiff's [] mark," for the inescapable conclusion from such similarity is that the cybersquatter seeks to trick a consumer intending to locate the mark holder on the internet. *Id.* at 207. Consistent with the Sixth Circuit's opinion in *Daimler*, SSN's decision to register PRU.COM, a domain name that is identical to Prudential's

12

PRU trademark, supports a finding of bad faith intent to profit under Factor V.

The second piece of circumstantial evidence of SSN's intent to divert customers away from Prudential is SSN's lack of any meaningful or persuasive explanation for acquiring the PRU.COM domain name. The absence of a persuasive alternative explanation is circumstantial evidence that supports a finding of a bad faith intent to profit.[14] Here, SSN's explanation for purchasing and registering the PRU.COM domain name is, in a word, implausible. Thus, it may be inferred that SSN purchased and registered the PRU.COM domain name to damage Prudential's brand so that Prudential would offer a substantial sum for the PRU.COM domain name to rectify its image. SSN's contention that SSN intends to develop PRU.COM into a financial news website and that PRU.COM is an appropriate name for this website because PRU supposedly translates in Chinese to Prussian news organization is more amusing than credible. Indeed, this argument serves only to underscore the fact that SSN purchased and registered PRU.COM with a bad faith intent to profit. After all, Prussia has not been a territory since the early to mid-20th century. Moreover, as a financial news company specializing in foreign exchange trading, it strains credulity to believe that SSN purchased and registered PRU.COM to cover financial news without considering that Prudential's N.Y. Stock Exchange ticker symbol is PRU.

SSN's implausible explanation for the registration of the PRU.COM domain name brings to mind *Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489 (2d Cir. 2000), where the cybersquatter claimed that he registered the domain name sportys.com "based on the existence of the dog Spotty." *Id.* at 499. There, the Second Circuit, concluded that the record established a bad

---

[14] *See Domain Name Clearing Co. v. LLC v. F.C.F., Inc.*, 16 F. App'x 108, 110 (4th Cir. 2001) (emphasizing that the alleged cybersquatter "did not offer any evidence of why it selected [the domain] name or what it intended to do with . .. [the] domain name"); *see also Digby Adler Grp. LLC v. Image Rent a Car, Inc.*, 79 F. Supp. 3d 1095, 1104 (N.D. Cal. 2015) (considering, as part of the bad faith intent to profit analysis, the cybersquatter's failure to provide an "alternative explanation" for its conduct).

faith intent to profit and noted that "the explanation given for Sporty's Farm's desire to use the domain name, based on the existence of the dog Spotty, is more amusing than credible." *Id.* Here, just as the Second Circuit did in *Sporty's Farm*, it is similarly appropriate to conclude that SSN purchased and registered the PRU.COM domain name with a bad faith intent to profit. Accordingly, SSN's explanation of its intended use of the PRU.COM domain name further supports a finding of a bad faith intent to profit under Factor V.

The third piece of circumstantial evidence of SSN's intent to divert customers away from Prudential is the fact that the U.S. version of the PRU.COM domain name displays hyperlinks to Prudential's competitor insurance companies, including Fidelity Life Insurance, Assurance Insurance, AIA Life Insurance, and Vitality Life Insurance. These hyperlinks to Prudential's competitor insurance companies literally divert customers from Prudential, and therefore support the inference that SSN purchased and registered the PRU.COM domain name for that purpose. SSN's counterarguments that it does not control what appears on the GoDaddy Parked Page is unavailing. SSN had the ability to prevent these links from appearing on the U.S. version of the PRU.COM page, and by choosing not to do so, it may be inferred that SSN intended the links to appear. *See BMG Rights Mgmt. (US) LLC v. Cox Communs., Inc.*, 881 F.3d 293, 307 (4th Cir. 2018) ("[A] person knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result"); GoDaddy Contract at 15–17 (Dkt. 84-5) (explaining that the GoDaddy Parked Page is the "default setting" and that the website owner can remove the GoDaddy Parked Page). Accordingly, Factor V favors Prudential and thus the transfer of the PRU.COM domain name to Prudential.[15]

---

[15] Seeking to avoid this conclusion, SSN argues that SSN could not have registered the PRU.COM domain name in order to divert customers from Prudential, as there is no direct evidence that SSN knew that "PRU" had been trademarked. SSN's claims of ignorance are not credible; Prudential is a well-known international insurance company that has trademarked the term PRU in over 20 different countries or territories, including Taiwan. SSN also admittedly

### 6. *Factor VI: SSN's offers to sell PRU.COM*

The sixth of the nine factors—whether SSN offered to sell the PRU.COM domain name—clearly favors Prudential. Importantly, there is no requirement under Factor VI that the cybersquatter make a formal offer to sell the domain name.[16]  Instead, Factor VI favors the mark holder where the record establishes that the alleged cybersquatter uses the domain name in order to procure an offer for purchase of the domain name.  Application of the sixth factor is well illustrated by *DSPT Intern., Inc. v. Nahum*, 624 F.3d 1213 (9th Cir. 2010).  There, the Ninth Circuit held:

> Factor VI may fairly be read to mean that it is bad faith to hold a domain name for ransom, where the holder uses it to get money from the owner of the trademark rather than to sell goods . . . Though there was no direct evidence of an explicit offer to sell the domain to DSPT for a specified amount, the jury could infer the intent to give back the site to DSPT only if DSPT paid Nahum the disputed commissions.

*Id.* at 1221.

---

formed a plan to submit trademark applications for PRU.COM in 2019.  Surely, SSN would have learned of Prudential's PRU mark through this trademark application process.  *See* Zhang Dep. Tr. 127:6–128:9 (Dkt. 90-7). SSN's purported ignorance of American businesses and/or marks is also not credible, for SSN purports to specialize in *foreign exchange trading* and has registered the majority of its domain names in English, including forexyelp.com, forexquora.com, forexquora.org, and forexchrome.com, named after popular American companies.  Moreover, SSN completely ignores the concept of constructive notice under § 1072, which states that "registration of a mark on the principal register . . . shall be constructive notice of the registrant's claim of ownership."  15 U.S.C. § 1072; *see also Stone Lion Capital Partners, L.P. v. Lion Capital LLP*, 746 F.3d 1317, 1324 (Fed. Cir. 2014); *Domain Name Clearing Co., LLC v. F.C.F. Inc.*, 16 F. App'x 108, 111 (4th Cir. 2001) (cybersquatter had a bad faith intent to profit even where the cybersquatter allegedly was not aware of the mark at the time of registration); Br. of Appellant, 2001 WL 36265826, at *6 ("At the time it registered the domain, DNNC was unaware of both F.C.F. and its Clarins trademark registration.").  In this respect, SSN's choice to register a number of different domain names with Verisign and GoDaddy, American companies, is in effect a decision "to play Internet ball in the American cyberspace" and therefore subjects him to this constructive notice requirement.  *Am. Online, Inc. v. AOL.org*, 259 F. Supp. 2d 449, 457 (E.D. Va. 2003).  SSN's contract with GoDaddy for the PRU.COM domain even reminded SSN that SSN should confirm that registration of the PRU.COM domain name did not interfere with another's intellectual property rights.  *See* GoDaddy Contract at 14 ("You represent and warrant to the best of your knowledge that, neither the registration of the domain nor the matter it is directly or indirectly used, infringes the legal rights of any third party.").  Accordingly, nothing about SSN's purported and implausible ignorance of the PRU mark alters the result reached here on summary judgment.

[16] This is so perhaps because, as the Fifth Circuit has noted, experience has taught "[m]any cybersquatters are now careful to no longer offer the domain name for sale in any matter that could implicate liability." *E. & J. Gallo Winery v. Spider Webs Ltd.*, 286 F.3d 270, 276 (5th Cir. 2002).

Other courts have similarly construed Factor VI to favor the mark holder where the record establishes that the alleged cybersquatter uses the domain name in order to procure an offer for purchase of the domain name. *See People for Ethical Treatment of Animals v. Doughney*, 113 F. Supp. 2d 915, 920 (E.D. Va. 2000) (Factor VI favored mark holder where the cybersquatter expressed an interest in what the mark holder would "offer him"), *aff'd*, 263 F.3d 359, 369; *Zinner v. Olenych*, 108 F. Supp. 3d 369, 389 (E.D. Va. June 4, 2015) ("The Court rejects Defendants' argument that Mr. Fernandez's statement that his client was 'interested in selling [the edzinner.com] domain name' cannot be construed as an 'offer to sell' the domain name.").

Here, the record establishes that SSN used the PRU.COM domain in order to secure an offer to purchase this domain name for a substantial sum—"six figure[s]." Partridge Decl. Ex. H. at 5. This is clear from (1) the screenshot of the U.S. version of the PRU.COM domain name, stating "Would you like to buy this domain name?"[17] and (2) the March 2020 emails memorizing Zhang's exchange with the GoDaddy representative. These emails make clear that SSN was looking to sell the PRU.COM domain name for a "six figure" sum. Partridge Decl. Ex. H. at 5. Thus, the record establishes that SSN used the domain name to procure a six figure sum. Accordingly, Factor VI also favors Prudential and thus the transfer of the PRU.COM domain name to Prudential.

### 7. Factor VII: SSN's use of false or misleading contact information when registering or maintaining PRU.COM

The seventh of the nine factors—whether SSN used false or misleading contact information when registering or maintaining the PRU.COM domain name—clearly favors Prudential. To begin with, the WIPO records establish that SSN listed Bailun as the Registrant Organization for the PRU.COM domain name, not SSN, the company for whom Zhang purchased this domain

---

[17] Giger Decl. Ex. A.

name.   Next, SSN did not make public its internal GoDaddy contact information, displaying instead the name "Registration Private."   Additionally, upon Prudential's inquiry on March 27, 2020, SSN changed the contact information for its GoDaddy account associated with PRU.COM, specifically on March 30, 2020 and again on April 9, 2020.   This initial concealment and later changing of the GoDaddy contact information is relevant to the bad faith inquiry.[18]   Moreover, this initial concealment and later changing of the GoDaddy contact information suggests an intent to conceal the true identity of the cybersquatter.   Accordingly, Factor VII clearly favors Prudential and thus the transfer of the PRU.COM domain name to Prudential.

### 8. Factor VIII: SSN's registration of other domain names

The eighth of the nine factors—whether SSN has registered other domain names—clearly favors Prudential.   This is so because SSN has registered over 100 domain names, including domain names that include the terms "yelp," "quora," and "chrome."   It is widely known that Yelp is a popular restaurant review service, that Quora is a popular internet question-and-answer service, and that Chrome is the popular web browser built by Google. SSN's decision to register these and a hundred other domain names clearly evinces a desire to traffic in domain names. *See Harrods*, 302 F.3d at 239 n.13 (emphasizing that Factor VII favors the mark owner where the cybersquatter is "in the business of cybersquatting, that is, [they have] registered hundreds of [unrelated] domain names, such as names incorporating marks like Bloomingdale's or Saks Fifth Avenue"). Additionally, the fact that SSN trafficked in these well-known marks belies SSN's claims of ignorance regarding American business marks and Prudential's PRU mark.   To the contrary, the fact that SSN registered domain names of popular American products demonstrates a familiarity

---

[18] *See Cazorla v. Hughes*, No. 14-cv-2112, 2014 WL 12235425, at *12 (C.D. Cal. Apr. 7, 2014) ("[D]efendants provided misleading false contact information when they transferred ThePaintedNail.com from the prior registrar to GoDaddy; they gave GoDaddy their own contact information instead of plaintiffs' and registered the domain name under their own GoDaddy account rather than The Painted Nail's.").

with American business and terms known to American consumers.  Accordingly, Factor VIII clearly favors Prudential and thus the transfer of the PRU.COM domain name to Prudential.

### 9. Factor IX: Prudential's PRU and PRU-formative marks are distinctive and famous

The ninth factor—the extent to which Prudential's PRU and PRU-formative marks are distinctive and famous—clearly favors Prudential.  To begin with, registration of a distinctive mark may itself satisfy Factor IX.  *See Eurotech, Inc. v. Cosmos European Travels Aktiengesellschaft*, 213 F. Supp. 2d 612, 626 (E.D. Va. 2002) (Factor IX "clearly satisfy[ied]" where the mark is "registered, incontestable, and distinctive.").  And here, Prudential has long held a trademark in the term "PRU," both domestically and abroad.  This mark is both distinctive and famous, even though it is only three letters in total and may perhaps be a descriptive, rather than a suggestive mark.  *See Virtual Works, Inc. v. Network Solutions, Inc.*, 106 F. Supp. 2d 845, 847 (E.D. Va. 2000) (Factor IX satisfied where the mark interfered with was Volkswagen's "VW" symbol), *aff'd* 238 F.3d 264, 269.  Although Prudential does not use its PRU mark in mainland China, the mark is used there by another company, and Prudential has trademarked the term "PRU" in other Asian-Pacific countries or territories, including Japan, Taiwan, and South Korea.  Accordingly, Factor IX clearly favors Prudential and thus the transfer of the PRU.COM domain name to Prudential.

In sum, each of the ACPA's nine factors points persuasively to the conclusion that SSN purchased and registered the PRU.COM domain name in bad faith intent to profit.  This conclusion is further confirmed by common sense.  Simply put, SSN, a serial cybersquatter, has no legitimate reason to register or hold a domain name that is identical to a trademarked term registered by a well-known company.  Accordingly, the PRU.COM domain name must be transferred from SSN to Prudential pursuant to § 1125(d)(1)(C).

Seeking to avoid this conclusion, SSN argues that the ACPA's safe harbor,

§ 1125(d)(1)(B)(ii) saves SSN.  It does not.  The Fourth Circuit has made clear that "[a] defendant who acts even partially in bad faith in registering domain name is not, as a matter of law, entitled to benefit from the Act's safe harbor provision."  *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 270 (4th Cir. 2001).  Thus, for the reasons set forth *supra*, the ACPA's safe harbor does not rescue SSN here.  No company specializing in foreign exchange trading could reasonably believe that a website (i) identical to a stock ticker and (ii) identical to a term trademarked in over 20 countries was lawful. As the undisputed facts show, SSN "has no trademark or intellectual property rights in pru.com."  SSN Opp'n at 9 (Dkt. 110). Nor does the record show that SSN obtained any valid property right in the PRU mark in any country prior to the WIPO action.  The PRU.COM domain name was also accessible in the United States.  Accordingly, the ACPA's safe harbor does not apply and the PRU.COM domain name must be transferred to Prudential.

Next, SSN contends that there can be no ACPA cybersquatting liability here because, according to SSN, cybersquatting cannot occur where the domain name has previously been registered.  Specifically, SSN contends that, because an unaffiliated Texas company initially registered the PRU.COM domain name, SSN's re-registration of the PRU.COM domain name in 2017 is not a qualifying "registration" within the meaning of the ACPA.  In support of this claim, SSN cites *GoPets Ltd. v. Hise*, 657 F.3d 1024 (9th Cir. 2011), a Ninth Circuit case holding that a re-registration of an existing domain name is not a "registration" under the ACPA.

The *GoPets* decision is not helpful to SSN.  There, an individual (Hise) registered a specific website in his own name and then re-registered the website in the name of a company owned by him and his brother.  *See id.* at 1027–28.  On these facts, the Ninth Circuit sensibly concluded that Hise was not a cybersquatter, given the minor, nominal change in ownership. Hise effectively controlled the subject website both before and after the change in the registration, and that clearly

was what mattered.  *See id.* at 1030–31.  The Ninth Circuit's decision is inapposite and does not apply to this case, where, contrary to *GoPets*, the initial registrant (an unidentified Texas Company) sold the domain name to SSN, an unrelated party.  Thus, *GoPets* is factually inapposite.

Moreover, in direct contrast to *GoPets*, numerous courts have held that a "re-registration" is a "registration" within the meaning of the ACPA.  As these cases illustrate, the Ninth Circuit's decision in *GoPets* is contrary to the plain text and statutory purpose of the ACPA, as there is no basis to "read additional words into the statue such as *initial* or *creation*." *Jysk*, 810 F.3d at 777 ("We accordingly will not read additional words into the statute such as *initial* or *creation*.  The plain meaning of *register* includes a re-registration.").[19]  The underlying rationale for the Ninth Circuit's decision—a public policy concern that innocent persons would be subject to ACPA liability for minor, periodic re-registrations of domain names—is best addressed through the bad faith intent to profit inquiry.  Clearly, a person who simply re-registers a domain name due to a periodic re-registration requirement does not act with a bad faith intent to profit in doing so.  Such a situation is quite different from the facts of this case, where an unrelated third party purchased the domain name.  Accordingly, nothing about *GoPets* alters the result reached here that the PRU.COM domain name must be transferred from SSN to Prudential pursuant to § 1125(d)(1)(C)

## III.

Both parties have also sought summary judgment on Count 2, a trademark infringement claim under § 1114.  To prevail on a claim for trademark infringement, the mark holder must establish (1) "that it possesses a mark"; (2) "that the defendant used the mark"; (3) "that the defendant's use of the mark occurred 'in commerce'"; (4) "that the defendant used the mark 'in connection with the sale, offering for sale, distribution, or advertising' of goods or services" and

---

[19] *See also Schmidheiny v. Weber*, 319 F. 3d 581, 583 (3d Cir. 2003) (same); *Xereas v. Heiss*, 933 F. Supp. 2d 1, 16 (D.D.C. 2013) (same).

(5) "that the defendant used the mark in a manner likely to confuse consumers." *People for Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 364 (4th Cir. 2001); 18 U.S.C. § 1114(1).  The parties here disagree on elements 2 and 3.  Specifically, the parties disagree whether SSN's registration and use of the PRU.COM domain name constitutes "use in commerce," given that the PRU.COM domain name has never displayed anything other than a GoDaddy Parked Page with pay-per-click advertising.  18 U.S.C. § 1114(1).

It is not necessary to determine whether SSN's registration and use of the PRU.COM domain name constitutes "use in commerce." 18 U.S.C. § 1114(1).  This is so because, in this *in rem* action, Count 2 may properly seek only transfer of the PRU.COM domain name, relief that will be awarded under Count 1.  As the statute makes clear, the sole remedy in an *in rem* action under § 1125(d)(2) is transfer of the domain name.  *See* 15 U.S.C. § 1125(d)(2)(D) ("The remedies in an in rem action under this paragraph shall be limited to a court order for the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark.").[20]

---

[20] *See also Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 232 (4th Cir. 2002) ("Transfer or cancellation of the defendant domain names is the only remedy available under § 1125(d)(2)'s in rem provision, so Harrods UK could gain no additional relief if the court considered and ruled on its infringement and dilution claim."); *beIn Media Grp. LLC v. bein.ae*, No. 3:18-cv-1042, 2019 WL 1129153, at *6–7 (S.D. Cal. Mar. 11, 2019); *3M Co. v. Thailand3M.net*, No. 1:11-cv-627, 2013 WL 2156322, at *11 n.6, *15 (E.D. Va. Apr. 23, 2013) (same).

To be sure, the ACPA also states, somewhat confusingly, that "any remedy available [in an *in rem*] action, shall be in addition to any other civil action or remedy otherwise applicable." 15 U.S.C. § 1125(d)(3).  This provision, properly read, does not permit monetary remedies in an *in rem* action.  If that were the case, then the highly specific restriction-of-remedies provision in Section 1125(d)(2) would be rendered meaningless.  Further, it is unclear how monetary remedies might be assessed or awarded in an *in rem* action, as the defendant in an *in rem* action is a piece of property, not a person.  *See, e.g. United Air Lines, Inc. v. Unitedair.com*, No. 1:12-cv-143, 2021 WL 2838629, at *7 (E.D. Va. June 11, 2012).  The better reading of this provision is that § 1125(d)(3) does not preclude (1) a *separate* civil action seeking alternative relief or (2) a regulatory action, such as the WIPO proceedings here.

In any event, monetary damages are inappropriate here (1) because this is not an exceptional cybersquatting case, (2) because no party has sought monetary damages on summary judgment or submitted evidence of diverted sales from Prudential, (3) because transfer of the PRU.COM domain name is a sufficient remedy in light of SSN's bad faith intent to profit, (4) because SSN's loss of the PRU.COM domain name and the $100,000 SSN purportedly spent on the PRU.COM domain name adequately serves the public's interest, and (5) because Prudential took several years to enforce its rights in the PRU.COM domain name, thereby weaking Prudential's claim to monetary damages. *See Synergistic Intern., LLC v. Korman*, 470 F.3d 162, 175 (4th Cir. 2006) (discussing factors to consider when awarding monetary damages under the Lanham Act).

Thus, because there is no additional relief to award for Count 2, as other courts have correctly held, there is no need to resolve Count 2.[21]   Accordingly, summary judgment is not reached here on Count 2, and Count 2 is appropriately dismissed without prejudice as moot.

## VI.

For the reasons stated above, summary judgment must be granted to Prudential on Count 1, a cybersquatting claim under the ACPA. The appropriate remedy for Count 1 is transfer of the PRU.COM domain name from SSN to Prudential.   Count 2 is appropriately dismissed without prejudice as moot because Count 2 seeks the very same relief that will be awarded for Count 1.

An appropriate Order will issue separately.

Alexandria, Virginia
June 30, 2021

/s/

T. S. Ellis, III
United States District Judge

---

[21] *See, e.g., Morris v. Pompeo*, -- F. Supp. 3d --, 2020 WL 6875208, at *9 (D. Nev. 2020) (dismissing as moot claim seeking relief duplicative of previously decided claim); *Everlast World's Boxing Headquarters Corp. v. Trident Brands Inc.*, No. 19-cv-503, 2020 WL 917058, at *7 (S.D.N.Y. Feb. 26, 2020) (same); *SEC v. Zenergy International, Inc.*, 430 F. Supp. 3d 384, 391 (N.D. Ill. 2019) (same).